[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11132

_____

MICHAEL CHAPMAN,

Plaintiff-Appellant,

*versus*

JEFFERSON S. DUNN,
Former Commissioner of the Alabama
Department of Corrections, in his Individual Capacity,
RUTH NAGLICH,
Assoc Comm Health A.D.O.C.,
MARY COOKS,
Former Warden Draper CF,
MICHELLE SAGERS COPELAND,
Former HSA,
CHARLIE T. WAUGH, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:20-cv-00007-WKW-CSC

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

After an untreated ear infection led to more serious injuries, Alabama inmate Michael Chapman sued prison officials and staff for exhibiting deliberate indifference to his medical needs in violation of the Eighth Amendment. The district court granted summary judgment for all defendants save one—the prison's medical contractor, which had filed for bankruptcy. Chapman presents several arguments on appeal. He contends that the district court wrongly rejected his claim against nurse Charlie Waugh as time-barred. He maintains that the court applied the wrong deliberate-indifference standard in adjudicating his claim against Waugh and erroneously rejected his request for injunctive relief against Commissioner John Hamm on sovereign-immunity grounds. And he insists that the district court failed to follow proper procedures in granting summary judgment against him.

After careful consideration of the parties' arguments, and with the benefit of oral argument, we reverse the district court's

determination that Chapman's claim against Waugh was time-barred, and we vacate and remand the district court's judgment for all other defendants.

# I

## A

Michael Chapman is an indigent Alabama inmate.[1] Throughout the period relevant to this appeal, he was incarcerated at Draper Correctional Facility in Elmore, Alabama. In June 2017, Chapman submitted a sick call complaining of an ear infection. That call went ignored, as did several others over the course of the next month. In August, Chapman met with nurse Charlie Waugh for a scheduled chronic-care visit regarding an unrelated issue. The parties dispute what happened during that visit: Chapman alleges that he showed Waugh clear evidence that he had an ear infection, including a Q-tip covered in pus that had drained from his ears overnight; Waugh asserts, to the contrary, that she saw no signs of an infection and that she told Chapman his ears were "pink and rosy." Chapman left the appointment with no treatment for his ailment. Over the next few months, Chapman continued submitting complaints about his ear infection—all of which went unanswered.

On January 1, 2018, prison staff found Chapman having a seizure in a bathroom. Emergency medical personnel transported

---

[1] We appointed Alexis Swartz to represent Chapman on appeal. She expertly discharged her responsibilities, and we thank her for her service to her client and the Court.

Chapman to the hospital, where doctors diagnosed him with "an untreated sinus infection that resulted in a bilateral ear infection and ruptured ear drum." His diagnosis also included mastoiditis—a bacterial infection of the mastoid bone behind the ear—as well as an abscess in his brain. Chapman had surgery to repair the mastoiditis and remove the abscess.

Chapman also had other medical problems relevant to this appeal. Back in 2016, he had surgery to fix a cataract in his left eye. He also has a cataract in his right eye, but prison officials have denied his multiple requests for surgery to correct it. According to the prison's current healthcare provider, that surgery isn't medically necessary because Chapman doesn't suffer from glaucoma or diabetic retinopathy. His right eye remains untreated.

**B**

Chapman filed suit pro se under 42 U.S.C. § 1983 against numerous prison officials and healthcare providers—including Jefferson Dunn (former commissioner for the Alabama Department of Corrections), Ruth Naglich (former associate commissioner), Mary Cooks (former warden), Corizon LLC (the company that held the contract to provide medical services at Draper), Michelle Sagers Copeland (Corizon's registered nurse), and Charlie Waugh (Corizon's nurse practitioner).[2] Chapman's amended complaint alleged that these defendants exhibited deliberate indifference to his

---

[2] John Q. Hamm, as the current Commissioner of ADOC, was substituted for Jefferson Dunn as a defendant in his official capacity.

medical needs by refusing to treat his ear infection, perform post-cataract surgery clean-up on his left eye, and perform cataract surgery on his right eye. Chapman also advanced state-law-negligence and medical-malpractice claims against Corizon, Copeland, and Waugh.

Some procedural and evidentiary back-and-forth ensued. After Chapman filed his amended complaint, a magistrate judge ordered the defendants to file answers and written reports with affidavits concerning the allegations raised in the complaint as well as any defenses. Some defendants partially complied; others initially failed to respond. Following the magistrate judge's issuance of further orders, the defendants filed their submissions. In August 2020, the magistrate judge ordered Chapman to file a response of his own. That order stated that "at some time in the future the court will treat Defendants' reports and Plaintiff's response as a dispositive motion and response" for summary-judgment purposes. About a year later, Chapman sought discovery pertaining to his medical records—which the court granted—and that discovery process continued until about November 2022. The court then ordered Chapman to respond to one of the defendants' declarations concerning his medical history. Although Chapman timely mailed his response, it wasn't docketed until late March 2023, by which point the magistrate judge had already issued his report and recommendation and the district court had already adopted it.

The report and recommendation advised granting summary judgment in favor of all defendants on Chapman's § 1983 claims.

The report deemed Chapman's deliberate-indifference claims against Copeland and Waugh time-barred because Chapman had filed his complaint more than two years after his last interaction with either defendant. The magistrate judge concluded that those claims also failed on the merits. The report further reasoned that Chapman's claims against Dunn, Naglich, and Cooks in their official capacities were barred by sovereign immunity. As for Corizon, the report concluded that Chapman had "present[ed] no evidence in his pleadings that [the company] had a policy or custom that contributed to his alleged constitutional violations." The magistrate judge declined to address Chapman's state-law claims.

Before the district court adopted the report and recommendation, Corizon filed a notice with the district court that it had entered Chapter 11 bankruptcy proceedings in the Southern District of Texas, which had entered an automatic stay of all judicial proceedings against the company. Accordingly, the district court stayed Chapman's action against Corizon until further order. The district court also ordered Corizon to file 90-day status reports on the bankruptcy proceedings and to provide notice once those proceedings ended. Corizon's bankruptcy case is ongoing, and the company has so far failed to provide the required updates.

The same day that it stayed the case against Corizon, the district court adopted the magistrate judge's report and recommendation as to all the other defendants, granting them summary judgment on Chapman's § 1983 claims and dismissing the state-law claims without prejudice. The district court entered final judgment

for those defendants under Federal Rule of Civil Procedure 54(b)—which allows for the entry of final judgment as to fewer than all claims or defendants "if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

This is Chapman's appeal. We consider the issues in the following order: first, whether we have appellate jurisdiction under Rule 54(b); second, whether Chapman's claim against Waugh was time-barred; third, whether the district court applied the correct deliberate-indifference test to Chapman's claim against Waugh; fourth, whether sovereign immunity barred Chapman's claim against Hamm; and finally, whether the district court gave Chapman notice and a reasonable opportunity to respond before granting the defendants summary judgment.

## II

We turn first to our jurisdiction under Rule 54(b). "[W]e consider the propriety of Rule 54(b) certification sua sponte because such certifications implicate the scope of our appellate jurisdiction." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997). We review de novo whether a district court's judgment is final—and for abuse of discretion whether the final judgment complied with Rule 54(b). *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 778 (11th Cir. 2007). Although we ordinarily don't defer to a district court's Rule 54(b) certification when the court "does not explain itself," if "the reasons for the entry of the judgment are obvious and remand to the district court

would result only in unnecessary delay in the appeal process, we will not require an explanation." *Ebrahimi*, 114 F.3d at 166.

## A

Rule 54(b) provides that a district court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Certifying a final judgment under Rule 54(b) requires "a two-step analysis." *Lloyd Noland Found.*, 483 F.3d at 777. "First, the court must determine that its final judgment is, in fact, both 'final' and a 'judgment.'" *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)). Second, "the district court must then determine that there is no 'just reason for delay' in certifying [the judgment] as final and immediately appealable." *Id.* (quoting *Curtiss-Wright*, 446 U.S. at 8). When deciding whether there is "no just reason for delay," the district court must "balance judicial administrative interests and relevant equitable concerns," considering "'the historic federal policy against piecemeal appeals'" along with "hardship or injustice associated with delay." *Ebrahimi*, 114 F.3d at 165–66 (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956)).

Two of our recent decisions illustrate the line between proper and improper Rule 54(b) certifications. In *Doe #1 v. Red Roof Inns*, we held that a district court didn't abuse its discretion in concluding there was no just reason to delay an appeal when "(1) the immediate resolution of an appeal would resolve issues in . . . four interrelated [] actions, streamlining the litigation; (2) there would

be a risk of duplicative discovery and trials without an immediate appeal, and an immediate appeal could serve to limit the scope of discovery; (3) the cases were still in the early stages of discovery, so duplicative discovery could best be avoided [through an immediate appeal]; and (4) COVID-19's impact on the defendants' operations could diminish the [plaintiffs'] ability to recover later on." 21 F.4th 714, 721–23 (11th Cir. 2021).  In *Peden v. Stephens*, by contrast, we dismissed an appeal for lack of jurisdiction because the district court's Rule 54(b) certification "rested on a single factual finding"— namely, that the COVID pandemic would delay the litigation.  50 F.4th 972, 979 (11th Cir. 2022).  The mere "inconvenience" of pandemic-related delay, we held, was insufficient justification to certify the partial appeal.  *Id.*

## B

Against this backdrop, we consider whether the district court's judgment here satisfied Rule 54(b)'s demands.  When the district court adopted the report and recommendation, it expressly found that there was "no just reason for delay" and certified its Rule 54(b) judgment as to all the defendants except Corizon.  Although the district court didn't further explain itself, the reasons for its Rule 54(b) certification were—and are—"obvious" from the record.  *See Ebrahimi*, 114 F.3d at 166.  On the same day it certified the Rule 54(b) judgment, the district court also stayed the case against Corizon due to the company's ongoing bankruptcy proceedings.  The district court referenced that stay in its order adopting the report and recommendation and announcing that it would enter final judgment.  Thus, we may uphold the district court's Rule 54(b)

certification if a remand "would result only in unnecessary delay in the appeal process." *Ebrahimi*, 114 F.3d at 166.

Applying the two-step analysis here, we hold that the district court's Rule 54(b) certification was proper. First, neither party disputes—and we conclude—that the district court's judgment was final because it "disposed entirely" of Chapman's claims against all the defendants except Corizon. *See In re Se. Banking Corp.*, 69 F.3d 1539, 1547 (11th Cir. 1995) (ruling that a judgment is final under Rule 54(b) if it "disposes entirely of a separable claim or dismisses a party entirely").

Second, the district court was right to conclude that there was "no just reason [to] delay" the entry of final judgment. *Lloyd Noland Found.*, 483 F.3d at 777. In certifying final judgment under Rule 54(b), courts weigh "judicial administrative interests" so as to "'preserve[] the historic federal policy against piecemeal appeals.'" *Ebrahimi*, 114 F.3d at 166 (quoting *Mackey*, 351 U.S. at 438). Moving ahead with this appeal doesn't threaten those interests because it won't require this Court to twice consider issues that may arise later vis-à-vis Corizon. *Cf. id.* at 166–67 (concluding that Rule 54(b) certification was improper in part because "the same operative facts serve[d] as the basis for each legal theory advanced by [the plaintiff]"). Chapman's claims against Corizon will ultimately hinge on whether the company had a "policy or custom" that contributed to his alleged constitutional injuries. That question is different from those on this appeal, which involve the statute of limitations and deliberate indifference. If Chapman were later to

appeal a judgment in Corizon's favor, there is no substantial risk that we would need to rehash the same issues.

This is also one of those rare cases in which "equitable concerns" warrant certification. *See id.* at 166. Corizon's bankruptcy proceedings are ongoing, with no indication that they will conclude anytime soon. *See generally Tehum Care Servs., Inc.*, No. 4:23-bk-90086 (Bankr. S.D. Tex.). Unlike in *Peden*, allowing an immediate appeal in this case "would alleviate some danger of hardship or injustice associated with delay." *Ebrahimi*, 114 F.3d at 166; *cf. Peden*, 50 F.4th at 979. The indefinite delay posed by Corizon's bankruptcy proceedings would prejudice Chapman in litigating his claims pro se and "diminish [his] ability to recover later on." *Red Roof Inns*, 21 F.4th at 721. Chapman is 60 years old and in poor health. Although some discovery has already occurred, delaying this appeal could well risk witnesses forgetting events or to otherwise becoming unavailable to testify. And witness testimony is pivotal to Chapman's deliberate-indifference claims, which turn on the defendants' state of mind. *See Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc). Indefinite delay would also hamper Chapman's efforts to seek injunctive relief against Commissioner Hamm for surgery to his right eye, the denial of which Chapman claims constitutes an ongoing constitutional violation.[3]

---

[3] In *Regueiro v. American Airlines*, we concluded that the "potential indefinite delay" due to one party's pending bankruptcy proceedings, "standing alone, [wa]s insufficient to warrant Rule 54(b) certification." No. 22-12538-DD, 2022 WL 18494920, at *2 (11th Cir. Dec. 2, 2022). That unpublished decision is both non-precedential, *see* 11th Cir. R. 36-2, and distinguishable. As explained in

We thus conclude that the district court properly entered final judgment in accordance with Rule 54(b).

## III

Turning to the merits, Chapman first argues that the district court erred in holding that his deliberate-indifference claim against Waugh was time-barred.[4]  We review the district court's conclusion de novo.  *Harrison v. Digital Health Plan*, 183 F.3d 1235, 1238 (11th Cir. 1999).

## A

The statute of limitations for a § 1983 claim is measured by limitations periods for personal-injury torts in the state where the action is brought, *see Wallace v. Kato*, 549 U.S. 384, 387 (2007)—which, in Alabama, is two years, *see* Ala. Code § 6-2-38(*l*).  Federal law, though, determines when a § 1983 plaintiff's cause of action accrues.  *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996).

"The general federal rule is that 'the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'"  *Id.* at 561–62 (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)).  Thus, a

---

text, forestalling Chapman's appeal would cause hardship beyond mere inconvenience and delay.

[4] Although the district court also ruled that Chapman's claim against nurse Michelle Copeland was time-barred, Chapman hasn't challenged that ruling on appeal.

§ 1983 action doesn't accrue "until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).  In assessing when a § 1983 claim accrues, courts also look to "'[t]he . . . cause[s] of action [that] provid[e] the closest analogy to claims of the type'" the plaintiff has alleged.  *See Wallace*, 549 U.S. at 388 (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)) (considering "the common law's distinctive treatment of the torts of false arrest and false imprisonment" to determine accrual date for a § 1983 false-arrest claim).

**B**

Chapman filed his complaint on December 23, 2019.  In holding that Chapman's deliberate-indifference claim against Waugh was time-barred, the district court emphasized that Waugh temporarily left her employment with Corizon on December 11, 2017.  It had thus been more than two years, the court reasoned, since Waugh could have "engaged in any of [the] challenged conduct about which [Chapman] complains."  The district court also found that Chapman "ha[d] not identified any facts . . . that could support a finding that he would not have been aware of any injury" that Waugh caused before she left Corizon.

The district court's focus on Chapman's interactions with Waugh—and thus on Waugh's actions toward Chapman—was misplaced.  Our caselaw makes clear that a § 1983 claim accrues only once the plaintiff knows or should know "the injury that

forms the basis of [his] complaint," as well as who caused that injury. *Chappell*, 340 F.3d at 1283. Chapman's complaint alleges that Waugh's deliberate indifference to his medical needs caused the injuries for which he seeks damages—namely, his mastoiditis, ruptured ear drum, and brain abscess. *See* Doc. 10-1 at 3–4. And Chapman couldn't have known of those injuries until he suffered a seizure and was admitted to the hospital, which occurred on January 1, 2018—*i.e.*, within the two-year statute of limitations.

Our decision in *Burgess v. United States*, 744 F.2d 771 (11th Cir. 1984), is instructive. The plaintiff there brought suit on behalf of his infant son under the Federal Tort Claims Act, alleging that army doctors had been negligent during his son's birth. *Id.* at 772.[5] Due to complications during delivery, the attending doctor had broken the son's clavicles, which caused a permanent nerve condition called Erb's Palsy. *Id.* Following the son's birth, the doctors informed his parents of the broken bones—but not the nerve damage. *Id.* Only about three weeks later did the parents "bec[o]me aware that, because of damage to his right brachial plexus, their son would not fully have the use of his right arm." *Id.* at 773. The district court dismissed the father's claim as untimely on the ground that "the actionable injury, if any, was the breaking of [the son's] clavicles" and because the parents' knowledge of that injury "was all that was required for the statute of limitations to begin to

---

[5] Like § 1983, the FTCA requires "knowledge of the cause and existence of an injury . . . before the statute of limitations begins running." *Id.* at 774 (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979)).

run." *Id.* We reversed. We held that "the injury in question" was not the broken bones but rather the permanent nerve condition. *Id.* at 774. And the record showed that the plaintiffs couldn't have become aware of that injury until later—within the two-year limitations period. *Id.* at 775.[6]

Again, Chapman's complaint here alleges that Waugh's deliberate indifference to his ear infection caused him to develop mastoiditis, a ruptured ear drum, and a brain abscess. *See* Doc. 10-1 at 3–4. Chapman seeks to recover for these later, more serious injuries and the "permanent damage" they caused. *Id.* at 5. Accordingly, his cause of action accrued only when Chapman became aware of those injuries. To be sure, Chapman could in theory have sued the day after he last saw Waugh, but that would have been a

---

[6] The Seventh Circuit reached a similar conclusion in a case involving deliberate indifference. The plaintiff in *Devbrow v. Kalu* knew, prior to going to prison, that he was at risk of developing prostate cancer because he had tests revealing that he had elevated PSA levels. 705 F.3d 765, 766 (7th Cir. 2013). His levels were still high while in prison, but the prison refused to authorize further diagnostic evaluations. *Id.* at 767. Eventually, the plaintiff got a biopsy and was diagnosed with metastatic prostate cancer. *Id.* The issue on appeal was whether § 1983's statute of limitations began to run on the date of the plaintiff's cancer diagnosis or earlier, when he could have sued for nominal or presumed damages without physical injury. *Id.* at 768–69. The Seventh Circuit held that the limitations period commenced on the later date. Even though it was theoretically true that the plaintiff could have sued earlier for nominal or presumed damages, "accrual rules are applied to the substance of the claim before the court, and *this* deliberate-indifference claim seeks redress for a concrete physical injury, not probabilistic future harm or an abstract injury for which nominal damages are available as a remedy." *Id.* at 769 (emphasis in original).

different lawsuit—with different alleged injuries and different damages. Looking at *this* suit as laid out in *this* complaint, Chapman's claim against Waugh accrued within the limitations period and is timely.

We therefore reverse the district court's holding that Chapman's claim against Waugh was time-barred.

## IV

Chapman also disputes how the district court analyzed the merits of his deliberate-indifference claim in granting summary judgment for Waugh. We review de novo a district court's grant of summary judgment. *Reyes v. Maschmeier*, 446 F.3d 1199, 1202 (11th Cir. 2006).

Chapman contends that the district court applied the wrong legal standard and "erroneously resolved credibility determinations and other questions of fact" in Waugh's favor. At minimum, Chapman asks us to remand in light of our recent en banc decision in *Wade*, which we issued after the parties briefed this appeal.

*Wade* clarified the standard governing deliberate-indifference claims under the Eighth Amendment. As an initial matter, we held, a plaintiff must show "that he suffered a deprivation that was, 'objectively, sufficiently serious.'" *Wade*, 106 F.4th at 1262 (quotation marks omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Having met that threshold, the plaintiff then must establish "that the defendant acted with 'subjective recklessness as used in the criminal law'"—*i.e.*, "that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of

serious harm to the plaintiff." *Id.* (quoting *Farmer*, 511 U.S. at 839). Finally, we added the "caveat" that "even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual Punishments Clause' if he 'responded reasonably to the risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 844–45).

Here, the district court issued its final judgment before we decided *Wade*. We therefore vacate the district court's judgment made in Waugh's favor on Chapman's deliberate-indifference claim and remand for the court to analyze that claim (as well as any surviving deliberate-indifference claims against the other defendants) in light of *Wade*.

## V

Chapman separately sued over his cataract issues. As relevant here, Chapman's complaint (1) contended that the prison's ongoing refusal to perform cataract surgery on his right eye constitutes deliberate indifference to a serious medical need and (2) sought an injunction ordering the prison to remedy that injury. The district court never addressed the merits of Chapman's cataract-related claim because it concluded that Hamm was entitled to sovereign immunity from claims for monetary damages. That ruling, which we review de novo, *see Reyes*, 446 F.3d at 1202, was incorrect. Chapman sought not only damages but also prospective injunctive relief, and it is hornbook law that sovereign immunity doesn't bar constitutional claims for such relief. *Ex Parte Young*, 209 U.S. 123, 155–56 (1908). The district court thus erred in granting

summary judgment in Hamm's favor on Chapman's cataract-related claim for injunctive relief.  Accordingly, we vacate and remand that claim so that the district court can properly address its merits under the standard articulated in *Wade*.

## VI

Chapman's final argument concerns summary-judgment procedure.  In particular, he contends that the magistrate judge didn't give him proper notice before issuing the report and recommendation.  In light of the two-year discovery process that was ongoing at the time, Chapman argues that he couldn't have known that the magistrate judge would recommend granting summary judgment against him.  He also asserts that the district court didn't give him enough time to respond to the magistrate judge's report and recommendation before adopting it.  We review a district court's management of its docket for abuse of discretion.  *Young v. City of Palm Bay*, 358 F.3d 859, 863 (11th Cir. 2004).

Rule 56(f) allows a district court to enter summary judgment "on its own" after identifying "material facts that may not be genuinely in dispute"—but only after "giving notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f).  This Court has "distinguished between *sua sponte* grants of summary judgment in cases involving purely legal questions based on complete evidentiary records, and cases involving factual disputes where the non-moving party has not been afforded an adequate opportunity to develop the record."  *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003) (footnote omitted).  "[S]ummary judgment

should be granted *sua sponte* only in those circumstances in which the dismissed claims have been fully developed in the evidentiary record and the non-moving party has received adequate notice." *Id.* at 1202. We have also emphasized that a district court "should be particularly careful to ensure proper notice to a pro se litigant so that any rights that such a litigant might have will not be extinguished merely through failure to appreciate the subtleties of modern motion practice." *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1368 (11th Cir. 2007) (alteration adopted) (quoting *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam)).[7]

In August 2020, the magistrate judge ordered Chapman to file a response to the defendants' answers and written reports—and stated that "at some time in the future" he would treat the parties' filings as "dispositive motion[s]" for summary-judgment purposes. Then followed more than two years of discovery during which the magistrate judge ordered the defendants to produce further reports and supporting declarations. The defendants failed to comply with

---

[7] We used to follow "a 'bright-line' test requiring 10-day advance notice that the court will take a motion for summary judgment under advisement as of a certain date." *Milburn v. United States*, 734 F.2d 762, 766 (11th Cir. 1984); *see also, e.g.*, *Moore v. Florida*, 703 F.2d 516, 519 (11th Cir. 1983) (per curiam); *Massey v. Cong. Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997) (collecting cases). That test was based on former Rule 56(c). *See* Edward J. Brunet, John Parry, & Martin H. Redish, *Summary Judgment: Federal Law and Practice* § 7.2 (2023). But the 10-day rule was superseded by the 2009 and 2010 amendments to Rule 56, *id.*, and Rule 56(f) now requires, more generally, that the district court provide a nonmovant with "notice and a reasonable time to respond," Fed. R. Civ. P. 56(f).

some of the magistrate judge's orders, prompting him to issue them anew.  In November 2022, after another order from the magistrate judge, the defendants filed a supplemental declaration that attached Chapman's medical records.  Chapman submitted a response to that declaration in which he disputed its conclusions and asserted that it didn't contain all relevant records.  Chapman mailed that response on November 26, 2022, but it wasn't entered on the docket until March 20, 2023.

By then, without any further notice, the magistrate judge had already issued his report recommending that the district court grant summary judgment in favor of all the defendants.  The report and recommendation gave Chapman 14 days to respond.  Chapman insists that he responded to the report and recommendation, but (for whatever reason) his filing never made it onto the docket.  Roughly four weeks after the report and recommendation's issuance, the district court largely adopted it and granted summary judgment for all defendants save Corizon.

In the circumstances here, the district court abused its discretion when it gave Chapman only 14 days to respond to the magistrate judge's report and recommendation.  The parties had been going back and forth in discovery for more than two years between the time when the magistrate judge said he would consider summary judgment "at some time in the future" and when he issued the report and recommendation.  The magistrate judge submitted the report and recommendation without providing Chapman any further notice—and before Chapman's response to the defendants'

medical declaration made it onto the docket. As an incarcerated pro se litigant, Chapman depended on the prison's mail system to receive and submit filings, and that system had already produced delays. *See Houston v. Lack*, 487 U.S. 266, 273 (1988) ("[T]he lack of control of *pro se* prisoners over delays extends much further than that of the typical civil litigant . . . ."). We hold that, in the particular circumstances here, 14 days wasn't "a reasonable time" for Chapman to object to the report and recommendation, *see* Fed. R. Civ. P. 56(f), and accordingly, that Chapman didn't receive "an adequate opportunity to develop the record" in this fact-intensive dispute, *see Artistic Entertainment*, 331 F.3d at 1201.

In short, the district court didn't give Chapman enough time to respond to the magistrate judge's report and recommendation before entering summary judgment against him. That error requires us to vacate and remand the district court's grant of summary judgment as to all the defendants.

## VII

In sum, the district court erred in holding that Chapman's deliberate-indifference claim against Waugh was time-barred, and we **REVERSE** on that issue. We **VACATE** the district court's grant of summary judgment for Waugh and **REMAND** so that the court can consider that claim in light of our intervening decision in *Wade*. We also **VACATE** the district court's judgment for Hamm on Chapman's deliberate-indifference claim for injunctive relief and **REMAND** so that the court can address the merits of that claim under *Wade*. Finally, due to its procedural error, we **VACATE** the

district court's judgment for all other defendants and **REMAND** for consideration of those claims in light of *Wade*.

23-11132          Jordan, J., Concurring          1

Jordan, Circuit Judge, Concurring:

The summary judgment order we set aside today was, in my view, the result of the special report process used in *pro se* prisoner cases in the Middle District of Alabama (and other district courts in the Eleventh Circuit). I join Judge Newsom's opinion for the court, but write separately to express my concerns about the use of the special report process. First, the process is not authorized by the Federal Rules of Civil Procedure. Second, the process is not codified in the local rules of the Middle District, making it very difficult (if not impossible) for prisoners (and other litigants) to figure out what it means in theory or how it works in practice. Third, as this case shows, the process—which was initially conceived of as a means to bring relevant facts to the attention of the district court at the beginning of a case and as a way to facilitate settlement and resolution of prisoner grievances—has morphed into an opaque pseudo-summary-judgment mechanism which improperly supplants the Rule 56 procedures and often leaves prisoners holding the short end of the discovery stick.

## I

This case arises from the Middle District of Alabama, which uses the special report process. *See, e.g., Lonich v. Carvajal*, No. 2:20-cv-864-RAH-CSC, 2023 WL 5969078, at *1–2 (M.D. Ala. Aug. 17, 2023). The process, however, is not codified in the Middle District's local rules. *See generally* Local Rules for the U.S. District Court for the Middle District of Alabama, Civil Rules and General Provisions (last amended Oct. 1, 2011).

I have not found any Middle District cases which explain the special report process in detail, but a case from the Southern District of Alabama contains this summary:

> [T]his court initially utilizes an *informal* special report proceeding in which prisoners or detainees allege that they have been deprived of constitutional rights. Under this special report procedure, once a complaint is reviewed pursuant to 28 U.S.C. § 1915A, the magistrate judge enters an order for [a] special report, directing the clerk of the court to send the named defendants a copy of the complaint and requesting [them] to submit a special report concerning the factual allegations made by the plaintiff in his complaint. [The] [d]efendants are also informed that they may submit their special report under oath or accompanied by affidavits so that the court may, if appropriate, consider the special report as a motion for summary judgment[.]

*Thomas v. Halley*, No. CA 99–0693–RV–C, 2000 WL 362043, at *3 (S.D. Ala. Mar. 17, 2000) (emphasis added). The Northern District of Alabama also treats the "special report" process as "informal." *Mansfield v. Bailey*, No. 7:20-cv-00215-ACA-HNJ, 2022 WL 21841718, at *1 (N.D. Ala. Apr. 22, 2022).

In practice, the special report process seems to consist of two essential elements. The first is an order issued soon after a *pro se* prisoner files a complaint under 42 U.S.C. §1983 requiring the submission of a special report by the defendant. The second is the later possible *sua sponte* conversion of the special report by the

magistrate judge or the district court into a motion for summary judgment by the defendant.[1]

Special reports originated in the 1970s with a recommendation from a Special Committee of the Federal Judicial Center, which had been established in response to "the burdens imposed upon the federal judicial system by the increasing volume of prisoner litigation." *Hardwick v. Ault*, 517 F.2d 295, 298 (5th Cir. 1975). A tentative draft of the Special Committee's initial report described a special report process in which a judge "determines the significant questions raised by the complaint and enters an order directing the state attorney general to furnish information regarding those questions to the court." *Id.* In 1975, the Former Fifth Circuit cautioned that, while special reports might be a viable means of gathering facts relevant to § 1983 cases filed by *pro se* prisoners, "if utilized, they should serve the useful functions of notifying the responsible state officials of the precise nature of the prisoner's grievance and encouraging informal settlement of it, or, at the least, of encouraging them to give the matter their immediate attention so that the case may expeditiously be shaped for adjudication." *Id.*

The special report process was initially used at the outset of a case to help the court in making necessary determinations under

---

[1] As explained in more detail later, the magistrate judge set out the process for submission of the special reports in an initial order. *See* D.E. 11. The magistrate judge first introduced the possibility of the eventual conversion of defendants' special reports into motions for summary judgment in his fourth order related to the special report process. *See* D.E. 36.

28 U.S.C. § 1915 relating to *in forma pauperis* status, frivolity, or ma-liciousness. *See, e.g., Taylor v. Gibson*, 529 F.2d 709, 711 (5th Cir. 1976) (describing the use of the special report process to determine the viability of *in forma pauperis* status for a *pro se* prisoner in a § 1983 case). In the beginning, special reports assisted in the factual development of cases where traditional discovery may have been less efficient, less productive, or otherwise too difficult. *See Bruce v. Wade*, 537 F.2d 850, 853 n.5 (5th Cir. 1976) (listing the "wide range of pre-trial procedures" available "for assessing the factual basis of the claims asserted"). Notably, the panel in *Bruce* listed the special report process and summary judgment procedures separately. *See Id.*

These initial uses aligned with thoughts expressed by the Federal Judicial Center's Prisoner Civil Rights Committee in a 1980 report, which explained that special reports could be useful in some cases "in order to discover the defendant's version of the facts and in order to encourage out-of-court settlements[.]" Prisoner Civil Rights Committee, *Recommended Procedures for Handling Prisoner Civil Rights Cases in the Federal Courts* 79 (Federal Judicial Center 1980). The Prisoner Civil Rights Committee envisioned that the "objective of the special report process [would be] to give the court the benefit of detailed factual information that may be helpful in identifying a case involving a constitutional challenge to an important, complicated correctional practice[.]" *Id.* It explained that special reports could serve as a productive supplement to traditional discovery. "Traditional discovery is usually limited to the facts relating to the individual petitioner while the issue may have

broader implications for other inmates and the correctional system generally." *Id*. at 81. My reading of the 1980 report, in conjunction with the caselaw of the period, leads me to conclude that the special report process was meant be a tool to aid in the more efficient gathering of relevant facts as cabined by the "the significant questions raised by the complaint[.]" *Hardwick*, 517 F.2d at 298.

The judicial conversion of a special report into a motion for summary judgment began in earnest in the late 1970s. In *Mitchell v. Beaubouef*, 581 F.2d 412, 414 (5th Cir. 1978), the former Fifth Circuit reviewed a district court's reliance on an unverified special report in dismissing with prejudice a civil rights complaint filed by prisoners. The *Mitchell* panel overturned the dismissal, explaining that "the [special] report, especially an unverified statement such as the one in issue here, cannot constitute a substitute for the type of proof required by the Federal Rules of Civil Procedure as a predicate for the summary disposition of a case." *Id*. at 416.

The decision in *Mitchell* triggered a predictable evolution in the tactics used by defendants in § 1983 cases brought by *pro se* prisoners. Special reports, rather than simply laying out the relevant facts and documents, started briefing the legal merits of the prisoner's claims, and defendants began attaching affidavits of the sort that might accompany a motion for summary judgment. *See, e.g., Farrow v. West*, 320 F.3d 1235, 1241–42 (11th Cir. 2003) ("The magistrate judge then ordered the defendants to review the subject matter of the complaint and file a written report containing the sworn statements of all persons connected with Farrow's § 1983 action.").

Earlier this month, a panel remarked that "the main point of the special report is to require the defendants to produce evidence to the plaintiff and the court, thereby progressing litigation beyond arguments about the sufficiency of the prisoner's allegations and directly to consideration of evidence at summary judgment or trial." *Horton v. Gilchrist*, ___ F. 4th ___, No. 23-13379, 2025 WL 481776, at *4 (11th Cir. Feb. 13, 2025). As this case shows, however, the special report process is broken.

## II

From my perspective, there are a number of problems with the special report process, particularly as it is used today.

### A

The first problem is that the special report process is not mentioned in, much less authorized by, the Federal Rules of Civil Procedure. And that is a problem when the process is used as a procedural substitute for the summary judgment procedures set out in Rule 56.

The Federal Rules create a comprehensive, stable, and relatively predictable procedural architecture for the conduct of litigation in the nation's Article III courts. The special report process, as noted, was developed in the 1970s in order to deal with the burdens imposed on the federal judicial system by increased prisoner litigation. *See Hardwick*, 517 F.2d at 298. But the Supreme Court has since told us that the federal courts "should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *Jones v. Bock*, 549 U.S. 199, 212 (2007). A

change or deviation "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993).

We should pay attention to these statements because they are not isolated, idle musings. The Supreme Court has on three occasions reversed judgments that were based on procedural requirements or innovations not set out in the Federal Rules. *See Jones*, 549 U.S. at 216 (reversing judgment based on a circuit-created rule requiring prisoners to plead exhaustion of administrative remedies—an affirmative defense—in their complaints); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–14 (2002) (reversing judgment based on a circuit-created rule requiring Title VII plaintiffs to allege in their complaints facts constituting a *prima facie* case of discrimination); *Leatherman*, 507 U.S. at 168 (reversing judgment based on circuit-created rule requiring § 1983 plaintiffs to satisfy a heightened pleading standard when asserting claims against municipalities). Notably, the special report process was conceived of, and implemented, before the Supreme Court decided *Leatherman*, *Swierkiewicz*, and *Jones*.

**B**

The second problem is that the special report process is not codified. It is nowhere to be found in the local rules of the Middle District; it is *ad hoc* and the particulars can therefore vary from one judge to another. As a result, *pro se* prisoners and the defendants they sue have no advance notice of the process that will govern

their case, and they learn about it only during the course of litigation.[2]

I am not as confident as the panel in *Horton*, 2025 WL 481776, at *4, about the smooth operation of the special report process, and I think—having seen a number of § 1983 appeals involving that process in the last decade—that in the quest for speed and efficiency we may have forgotten "the special care with which *pro se* litigants must be treated," and ignored the reality that "such litigants occupy a position significantly different from that occupied by litigants represented by counsel." *Johnson v. Pullman, Inc.*, 845 F.2d 911, 914 (11th Cir. 1988) (citation and internal quotation marks omitted).

Take, as an example, *Coleman v. Smith*, 828 F.2d 714 (11th Cir. 1987). In *Coleman* a prisoner filed a complaint alleging due process and equal protection claims arising out of two prison disciplinary proceedings, one on April 27, 1986, and the other on April 29, 1986. The district court used the special report process and converted the defendants' report into a motion for summary judgment. *See id.* at 715–16. Although the defendants never addressed the prisoner's claims concerning the first disciplinary hearing in their report or attached affidavits, the district court granted summary judgment in their favor across the board. The *Coleman* panel vacated in part the summary judgment order. Because there "was no denial of

---

[2] As far as I can tell, the special report process is also not codified in the local rules of the Northern or Southern Districts of Alabama.

[the April 27, 1986] allegations, it was inappropriate for the district [court] to grant summary judgment to the defendants." *Id.* at 717.

As I will detail later, similar problems continue today, as exemplified by Mr. Chapman's case. Under the uncodified special report process, the defendants here disregarded court orders and failed to (a) provide necessary and relevant information and documents concerning the claims, or (b) execute or attach the required affidavits. And there were no real adverse consequences for such behavior. At most the defendants received gentle prodding from the magistrate judge to supplement their deficient special reports.

## C

The third problem with special reports is that they can—and do—simultaneously serve as a one-stop-shop for the defendants' informal answer to the complaint, provision of discovery, and summary judgment briefing on the merits. Although a defendant is not "required to file an answer before moving for summary judgment," 10A Mary Kay Kane, Fed. Prac. & Pro. § 2718 (4th ed. & June 2024 update), ordinarily a motion for summary judgment follows the filing of an answer and the taking of discovery, *see So. Pac. Transp. Co. v. Nat'l Molasses Co.*, 540 F.2d 213, 214 n.1 (5th Cir. 1976); *see also Jefferson v. Chattanooga Pub. Co.*, 375 F.3d 461, 463 (6th Cir. 2004) ("Rule 56(b) allows a defendant to file [a summary judgment] motion at any time, so long as the non-moving party has had sufficient time to engage in discovery.").

Mr. Chapman's experience in this case shows how the special report process turns the traditional model of adversarial civil

litigation on its head.  And it tells a cautionary tale of how defendants can use the process to provide only the documents and information that they have cherry-picked while withholding relevant discovery.

**1**

Mr. Chapman is not the average *pro se* prisoner plaintiff.  He made every effort to, and for the most part did, abide by court orders and prosecute his case to the best of his abilities.  His pleadings and motions, though handwritten, were legible, coherent, and reflective of an earnest attempt to resolve the serious medical issues he complained of.  Nevertheless, he unsurprisingly had some difficulty navigating a special report process he would have had no reason to know of (or understand) prior to the magistrate judge announcing its use.

By all accounts Mr. Chapman did his research prior to filing his lawsuit and his initial and amended complaints satisfied the requirements of the Federal Rules of Civil Procedure and the Middle District's local rules.  He properly titled his action and separately numbered the paragraphs.  *See* Fed. R. Civ. P. 10(a).  His complaint was legibly handwritten and he signed it under penalty of perjury.  *See* M.D. Ala. Civ. R., L.R. 9.1(a)(1), (a)(2).  He filled out a pauper's affidavit on the court-provided form.  *See id.* L.R. 9.1(a)(3).  And in his court filings he relied on and accurately cited, relevant caselaw and other authorities.

Mr. Chapman explained that he was recovering from a stroke and was mentally and physically impaired.  *See* D.E. 8 at 1.

He explained that he had limited access to the prison law library due to quarantines and lockdowns resulting from violence and COVID-19. *See id.*; D.E. 37 at 1. He explained the prison law library had only two computers to serve over one thousand inmates, so computer time was rationed to one hour per day. *See* D.E. 8 at 2. He explained he was not able to print anything and instead had to handwrite any relevant authority he wanted to preserve for future use. *See id.* He explained that his thought process had been slowed and he had trouble writing things properly in the wake of his stroke, so his writing needed additional time for edits. *See id.* He was, in sum, an incarcerated litigant who needed the court to ensure a level playing field.

In his amended complaint, Mr. Chapman alleged deliberate indifference by the defendants with respect to cataracts in both of his eyes and a sinus and ear infection culminating in his hospitalization, coma, and many lifelong impairments. *See generally* D.E. 10. It is worth mentioning that Mr. Chapman attempted to, and seems to believe that he did, incorporate by reference or otherwise attach as an exhibit the allegations he had made in his initial complaint. *See* D.E. 10-1 at 1. Although the magistrate judge's order requiring the amended complaint emphasized that the new pleading would "supersede the original complaint," D.E. 7 at 4, no subsequent order ever addressed whether Mr. Chapman's attempt to include his

prior allegations in his new complaint was appropriate or success-ful. [3]

In his first order on the special report process, the magistrate judge stated that the amended complaint could not "be properly and effectively processed by the court without further additional information from Defendants." *See* D.E. 11 at 1. Given Mr. Chapman's allegations and claims, I do not see why the case could not have been handled in the normal way—the way called for by the Federal Rules.

**2**

The magistrate judge's initial order regarding the special report process was clear as to what the defendants had to do and what the special reports had to contain. *See* D.E. 11. But the defendants found it difficult to properly respond to court orders or simply chose to provide only what was best for their interests.

Pursuant to the initial order, the defendants were to "under-take a review of the subject matter of the amended complaint" for

---

[3] As an aside, Mr. Chapman asserted an alternate theory of deliberate indifference that went unnoticed by the defendants, the magistrate judge, and the district court. He claimed that the cause of his ear infection could be traced to unsanitary conditions at the facilities in which he was housed and which he alleged the defendants were aware of. *See* D.E. 10 at 3. And he attempted to incorporate by reference a "DOJ Report filed April 2019." *Id.* I suspect the report Mr. Chapman referenced was one which found that "decrepit conditions are common throughout Alabama's prisons." U.S. Dept. of Justice, Civil Rights Division, *Investigation of Alabama's State Prisons for Men* 46 (Apr. 2, 2019). Whatever its merits, this theory was never addressed in the defendants' special reports. Nor was it resolved by the magistrate judge or the district court.

the purpose of acquiring relevant facts, considering "whether any action should be taken by jail officials to resolve the . . . complaint," and to determine whether any similar complaints should be considered together. *See id*. at ¶ 1. The defendants had to file their special report by a specified date that "must contain" sworn affidavits of every defendant regarding the subject matter of the complaint, and where appropriate "should contain" sworn affidavits from any other prison or medical personnel with personal knowledge of the same subject matter. *See id*. at ¶ 2. The defendants were instructed that all defenses "must be set forth in the written report or such defenses may be waived," thereby making the special report akin to an informal answer outside the ambit of Rules 8(b)–(c) and 12(a)(1)(A) of the Federal Rules of Civil Procedure. *See id*. at ¶ 3.

The initial order authorized the defendants to interview all witnesses, including Mr. Chapman. *See id*. The defendants were told to attach the medical records "relevant to the claims raised in the amended complaint . . . in chronological order." *Id*. They were also required to "include copies of all . . . administrative rules, regulations, or guidelines" relevant to any claim or defense as attachments to the special report. *See id*. Finally, they were instructed that, should they assert failure to exhaust administrative remedies as a defense, they "must specifically identify the grievance procedure available to [Mr. Chapman] and/or the manner in which [he] failed to exhaust a grievance procedure." *Id*. at ¶ 4.

The initial order concluded by stating, in no uncertain terms, that "[**n**]**o** motion for summary judgment, motion to dismiss or any other dispositive motions addressed to the amended complaint [could] be filed by any party without permission of the court." *Id.* at ¶ 6. Again, the relevant provisions of the Rules of Civil Procedure, namely Rules 12(b)(6) and 56, were put off to the side.

### 3

A number of the defendants (Jefferson Dunn, Mary Cooks, and Ruth Naglich) missed the deadline for their special report. They filed it over a month late, and only after receiving a show cause order. *See* D.E. 23 (order to show cause); D.E. 29 (special report). The other defendants (Michelle Copeland, Charlie Waugh, and Corizon) essentially ignored every single one of the magistrate judge's instructions regarding their special report (other than meeting the filing deadline). *See* D.E. 13. And none of the defendants ever managed to organize Mr. Chapman's relevant medical records in full chronological order.

In their two initial special reports, and in violation of the magistrate judge's order, the defendants submitted only a single affidavit. That was the four-paragraph affidavit of an attorney in the General Counsel's Office of Corizon. *See* D.E. 13-1. That affidavit stated only that (a) Corizon had a contract with the Alabama Department of Corrections from November 1, 2007, until March 31, 2018, after which Wexford took over; and (b) Ms. Copeland and Ms. Waugh were employed by Corizon at the Staton and Draper

Correctional Facilities (November 1, 2007, until November 29, 2017, for Ms. Copeland and May 25, 2017, until December 12, 2017, for Ms. Waugh).[4]

The two initial special reports did not reference or attach any medical records. And they were not accompanied by any affidavits of the defendants. Beyond the research into the dates of employment for Ms. Copeland and Ms. Waugh with Corizon, neither report indicated that any investigation of the underlying claims had been started, much less completed. And there were no indications that any of the defendants or Mr. Chapman had been interviewed.

Instead, the two initial special reports were simply motions for summary judgment by another name. *See* D.E. 13 (featuring

---

[4] Ms. Waugh's dates of employment would later be challenged by Mr. Chapman, who stated in his sworn response to the defendants' special reports that he personally saw Ms. Waugh working after the date stated in the affidavit by the Corizon attorney. *See* D.E. 43 at 21. The affidavit submitted by the defendants would also eventually be called into question by Ms. Waugh herself. Over two years after the filing of this first affidavit, and after prodding by the magistrate judge, *see* D.E. 49, Ms. Waugh finally filed her own affidavit stating that she "was employed as a nurse practitioner by Corizon, LLC at the Staton and Draper Correctional Facilities from May 25, 2017, until Wexford took over on April [2018]," D.E. 50-1 at 2. To make matters even more confusing, Ms. Waugh seemed to then contradict that statement in the very next paragraph of her affidavit, saying that she "was on FMLA [leave] from December 11, 2017, until the end of February 2018," but that she "was not employed by Corizon at the Staton/Elmore Correctional Facilities on January 4, 2018." *Id.* Ms. Waugh's actual employment records were never produced in any form to resolve this confusion, though Mr. Chapman sought them via discovery. *See* D.E. 44 at 2.

two paragraphs of facts recounting Mr. Chapman's allegations and ten pages of summary judgment arguments); D.E. 29 (featuring three paragraphs of facts recounting Mr. Chapman's allegations and five pages of summary judgment arguments). The special reports were almost entirely focused on what Mr. Chapman had allegedly failed to prove at a stage in the litigation when no answers had been filed and when no discovery (e.g., medical records) had been provided by the defendants. Such failures made it virtually impossible for Mr. Chapman to respond or avoid summary judgment.

The defendants' premature summary judgment arguments pervaded and undermined the factual development that followed. Consider the defendants' meritless statute of limitations argument and its recurring effect on the litigation. The defendants chose January 6, 2018, as their statute of limitations accrual date. *See* D.E. 13 at 3. They seem to have picked that date by looking at the date on which Mr. Chapman's complaint was docketed, January 6, 2020, and then subtracting two years.

As Mr. Chapman correctly explained, even this simple arithmetic calculation was wrong. The certificate of service stated that he mailed the complaint on December 23, 2019, and even included a proper citation to *Houston v. Lack*, 487 U.S. 266 (1988), to invoke the prison mailbox rule. *See* D.E. 1 at 44; D.E. 43 at 20. As Judge Newsom has already explained in the majority opinion, the defendants' argument was flawed. But the record below was shaped by a statute of limitations argument that lacked merit.

During the course of the litigation, and after Mr. Chapman had filed his only response to the special reports that would be considered by the magistrate judge in his report and recommendation, *see* D.E. 43, the defendants relied on the statute of limitations argument to cabin the breadth of medical records they would produce in response to Mr. Chapman's discovery requests, *see, e.g.,* D.E. 46 at ¶¶ 5, 6, 7, 8, 9 (objecting to the production of any medical records prior to January 6, 2018, on the theory that any such information could only possibly relate to claims "barred by the statute of limitations due to the fact that [the complaint] was filed on January 6, 2020"). Mr. Chapman sought to obtain the necessary records through subsequent discovery requests (e.g., any EMT notes from the ambulance service; all medical records from Jackson Hospital from December 31, 2018, until January 4, 2018; all medical records from the University of Alabama at Birmingham Hospital from January 3, 2018, until January 12, 2018; and employment records for both Ms. Waugh and Ms. Copeland). *See* D.E. 48. But the magistrate judge denied this discovery request on the ground that the defendants had been "ordered to provide copies of all permissible records and documents relevant to the claims against them" in filing their special reports and responses to discovery; the defendants were simply ordered to make another attempt at supplementing their special reports with "the affidavits or sworn statements of [Ms.] Copeland and [Ms.] Waugh regarding their knowledge of the subject matter of the amended complaint." D.E. 49 at 1–2. The problem, of course, was that the defendants had not provided copies of all relevant records and had unilaterally decided to turn over

only some of them.  No additional documents would ever be produced in response to Mr. Chapman's discovery requests.[5]

The defendants responded with two additional supplements to the special reports.  *See* D.E. 50; D.E. 51.  The first supplement contained a two-page declaration signed by Ms. Waugh acknowledging her awareness of the complaint and its contents, along with her employment dates.  *See* D.E. 50-1.  Ms. Copeland's declaration, attached to the second supplement, was equivalently sparse.  *See* D.E. 51-1.  Neither declaration addressed any of Mr. Chapman's allegations beyond stating a total lack of knowledge.  Nor did the declarations address or interpret records produced by Mr. Chapman which related to Ms. Waugh or Ms. Copeland's interactions with him and which they appear to have signed.  *See*, *e.g.*, D.E. 47-1; D.E. 47-6.  The defendants never produced a single affidavit in which any of them or any other prison officials or medical professionals professed to have direct, personal knowledge of any of Mr. Chapman's medical problems or care while in custody, his medical

---

[5] It is not clear whether the magistrate judge considered in his report and recommendation any of the briefing surrounding Mr. Chapman's discovery requests, the defendants' objections or documents produced in response to those requests, or Mr. Chapman's response to the defendants' objections.  The report and recommendation never acknowledged these filings and only referred to the special reports, their supplements, and their attached evidentiary materials.  *See* D.E. 56 at 2.  This is important, as Mr. Chapman's 26-page response to the defendants' discovery objections contained large sections of factual proffers, was sworn to by Mr. Chapman, and was accompanied by seven additional attached exhibits.  *See* D.E. 47.

grievances and appeals, or his treatment following his hospitalization due to mastoiditis.

4

In his final order on the special report process, which required the defendants to file additional supplements to their special reports, the magistrate judge once again required the defendants to provide the medical records relevant to Mr. Chapman's sinus and ear infections "**in chronological order**," and to submit an affidavit from a medical care provider "**as a separate exhibit**" that "**interprets the medical records specifically requested**," as well as a supporting affidavit and relevant medical records addressing the cataracts issues. *See* D.E. 54. These commands again fell on deaf ears.

The defendants filed their response to this order and their final supplement to the special reports on November 16, 2022, over two and a half years after Mr. Chapman filed his complaint. *See* D.E. 55. The supplement contained a single exhibit—the second declaration of Dr. Hugh Hood, the Regional Medical Director for Wexford—along with a handful of medical records relating to both of Mr. Chapman's cataracts as well as his ear infection and mastoiditis. *See* D.E. 55-1. With respect to the ear infection, Dr. Hood's affidavit only listed the date and alleged results of a chronic care visit with Ms. Waugh and the date Mr. Chapman was transported to Jackson Hospital for altered mental status. *See id.* at 2. With respect to the cataracts, Dr. Hood's affidavit similarly cataloged Mr. Chapman's encounters with medical professionals while offering nothing in the way of interpretation or medical analysis. *See id.* at

3–4.  This supplement would be the defendants' final submission before the magistrate judge issued his report and recommendation on the special reports and subsequent supplements that were converted into the defendants' motions for summary judgment.  *See* D.E. 56.

Mr. Chapman's response to the defendants' supplements went undocketed by the district court until after final judgment had been entered.  *See* D.E. 63 (Mr. Chapman's response to the defendants' special report supplements with a certified mailing date of November 26, 2022, but docketed on March 20, 2023).  As a result, Mr. Chapman's only response to the summary judgment motions (i.e., the special reports and their supplements) considered by the magistrate judge and the district court came over a year and a half before the defendants submitted the affidavits of Ms. Waugh, Ms. Copeland, and Dr. Hood, or a single one of the relevant medical records.  *See* D.E. 43 (Mr. Chapman's response to the original special reports and the first supplement, D.E. 13, D.E. 29, and D.E. 35, mailed January 28, 2021); D.E. 50 (second special report supplement with Ms. Waugh's affidavit, filed September 29, 2022); D.E. 51 (third special report supplement with Ms. Copeland's affidavit, filed October 4, 2022); D.E. 53 (fourth special report supplement with Dr. Hood's affidavit and some of Mr. Chapman's medical records, filed October 26, 2022); D.E. 55 (fifth and final special report supplement with another affidavit from Dr. Hood and a handful of additional medical records, filed November, 16, 2022).  As noted, Mr. Chapman's last attempt to employ traditional discovery to obtain what he believed to be additional important sources of

necessary facts was denied by the magistrate judge in favor of continuing to resort to defendants' supplements to the special reports. *See* D.E. 49.

All told, at the time of the report and recommendation by the magistrate judge, the special report process had been ongoing for about two and a half years. In that time, the process had produced seven court orders, two special reports, five supplements to those special reports, eight affidavits, and a little over 100 of Corizon and Wexford medical records. And, it bears repeating, the defendants' supplements, though individually offering only limited factual insight, all only came after additional court orders requiring them.

**5**

Without any formal codification of the special report process, a court is free to continue to order and re-order additional factual proffers in a manner that facilitates the defendants' ability to repeatedly make incomplete, piecemeal productions in the hopes that each individual submission might be enough to prevail on the summary judgment arguments they have already made, but without any concern that they will be foreclosed from a subsequent proffer should that prove to not be the case. And all the while, the prisoner is left without access to meaningful discovery because the defendants essentially get to decide what to turn over.

In a normal Rule 56 setting, if the moving party does not properly support its motion for summary judgment, the district court simply denies the motion and the case goes to trial. But here

it seems to me that the magistrate judge, after seeing the defend-
ants repeatedly fail to comply with his initial order on the special
report process, essentially gave them additional chances to seek
summary judgment by submitting supplements to the special re-
ports. This seems to me like a court advising one side (the defend-
ants) but not the other (Mr. Chapman) on how to properly submit
and document a motion for summary judgment after the initial
submissions were found wanting.

### III

In my opinion, the special report process is problematic.
First, the process is not referenced in, or authorized by, the Federal
Rules of Civil Procedure. And the Supreme Court has told federal
courts several times in no uncertain terms that they are not to
tinker with the Federal Rules due to perceived policy concerns.
Second, the process is not codified in the local rules of the district
courts in Alabama. This makes it difficult for *pro se* prisoners to
understand what the process entails. Third, over time the process
has become an informal and opaque pseudo-summary-judgment
process outside of the Rule 56 procedures. It operates to neglect
the "responsibility of the courts to be sensitive to possible abuses
in order to ensure that prisoner complaints, particularly pro se
complaints, are not dismissed prematurely[.]" *Taylor*, 529 F.2d at
713.

Moreover, the special report process in this case did nothing
to further the efficient handling of the case. The process lasted
more than three years from the filing of Mr. Chapman's initial

complaint.  Given this timeline, was this special report process any more efficient, transparent, or fair than a case litigated under the Federal Rules?

I urge the district courts in the Eleventh Circuit to re-evaluate the special report process as it is used today and consider simply using the Federal Rules as the procedural template for § 1983 cases brought by *pro se* prisoners.  And if the district courts determine that the special report process is somehow consistent with the Federal Rules, then I strongly recommend that they standardize and codify the process in their local rules to ensure that litigants have notice of what awaits them, that prisoners receive all of the discovery relevant to their claims, and that defendants are not provided multiple opportunities to fix their deficient summary judgment submissions.